# EXHIBIT N

1

```
          IN THE UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF NEW YORK
          CIVIL ACTION NO. 07-CV-03907(BSJ)(JCF)

---------------------------------x
EASYTEX CORPORATION LIMITED,


                    Plaintiff,



     v.



PETER & FRANK OF NY, CORP,
CHUL KYU KIM a/k/a KIM CHUL KYU,
a/k/a CHUK CHUL KIM a/k/a ROBERT
CHUL KIM a/k/a CHUL KYOO KIM a/k/a
CHULKYOO KIM a/k/a KIM K. CHUL,
BARO SHIPPING CO., LTD., TOP TEN
TRANS, INC., GFA, INC., 3 WIN, INC.,
MERCURY, AMERICAN INTERNATIONAL LINE,
INC., SOON CHAN HONG a/k/a SOON C. HONG,
a/k/a SOONCHAN C. HONG, a/k/a SOON CHAN
HONG, a/k/a CHAN S. HONG, a/k/a HONG S.
CHAN, a/k/a HONG SOON CHANG, d/b/a
SOONCHAN HONG CUSTOM HOUSE BROKER, STOP &
STOR, NEXXON TRADING, INC., SOLUTION USA,
INC., GAVIN FASHION, INC., KOREA EXPRESS
USA, JKM USA, CORP., WESTY STORAGE CENTERS,
jointly and severally,


                    Defendants.

---------------------------------x

                         Friday, August 8, 2008
                         10:21 a.m.



Reported by:
Amy A. Rivera, CSR, RPR, CLR
```

*Condensed Copy* (watermark)

### Page 2

```
 1
 2         Deposition of IRIS SHON
 3   held at Rockefeller Group Business Center,
 4   45 Rockefeller Plaza, Suite 2000, New York,
 5   New York, pursuant to Notice, before Amy
 6   A. Rivera, a Certified Shorthand Reporter,
 7   Registered Professional Reporter, Certified
 8   LiveNote Reporter, and a Notary Public.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

### Page 3

```
 1
 2  APPEARANCES:
 3  THE PARK LAW GROUP, LLC
    BY: HYUN SUK CHOI, ESQ.
 4      23 S. Warren Street, 2nd Floor
        Trenton, New Jersey 08608
 5      Attorneys for Plaintiff
 6
 7  RODRIGUEZ O'DONNELL ROSS GONZALEZ & WILLIAMS
    BY: HENRY P. GONZALEZ, LL.M.
 8      1211 Connecticut Avenue, N.W., Suite 800
        Washington, D.C.
 9      Attorneys for the Top Ten Trans, Inc., GFA, INC.,
        and the Deponent
10
11  CARL E. PERSON, ESQ.
        325 W. 45th Street, Suite 201
12      New York, New York 10036
        Attorneys for Defendants American International
13      Line, Inc. and Mercury
14
15  LAW OFFICES OF HARVEY & VANDAMME
    BY: WILLIAM AMBROSE, ESQ.
16      90 Broad Street, Suite 2202
        New York, New York 10004
17      Attorneys for Defendant Stop & Stor
18
19  LAW OFFICES OF JOHN C. LANE
    BY: PETER C. BOBCHIN, ESQ.
20      PMB 46013
        140 Broadway, 46th Floor
21      New York, New York 10005
        Attorneys for Defendant Korea Express
22
23  LAW OFFICES OF JEFFREY S. STEPHENS, P.C.
    BY: JEFFREY S. STEPHENS, ESQ.
24      14 Duncan Drive
        P.O. Box 11177
25      Greenwich, Connecticut 06831-1177
```

### Page 4

```
 1
 2  A P P E A R A N C E S (continued)
 3  ALSO PRESENT:
 4      GIRA HONG, Korean Interpreter
 5
```

### Page 5

```
 1
 2              IT IS HEREBY STIPULATED AND AGREED by and
 3   between counsel for the respective parties hereto that
 4   all rights provided by the C.P.L.R., including the right
 5   to object to any question, except as to the form, or to
 6   move to strike any testimony at this examination, are
 7   reserved; and, in addition, the failure to object to any
 8   question or to move to strike any testimony at this
 9   examination shall not be a bar or waiver to make such
10   motion at, and is reserved for, the trial of this
11   action.
12              IT IS FURTHER STIPULATED AND AGREED that
13   this examination may be signed and sworn to, by the
14   witness being examined, before a notary public other
15   than the notary public before whom the examination was
16   begun, but the failure to do so, or to return the
17   original of this examination to counsel, shall not be
18   deemed a waiver of the rights provided by Rules 3116 and
19   3117 of the C.P.L.R. and shall be controlled thereby.
20              IT IS FURTHER STIPULATED AND AGREED that
21   the filing of the original of this examination shall be
22   and the same hereby is waived.
23
24
25
```

2 (Pages 2 to 5)

Page 6:

```
                        I N D E X
WITNESS                                      PAGE
IRIS SHON
  BY MR. CHOI                                  7
            E X H I B I T S
NUMBER    DESCRIPTION
Shon-A    Business entity status report       15
Shon-B    Shipping information                41
Shon-C    Handwritten notes                   61
Shon-D    Handwritten notes                   61
```

Page 7:

IRIS SHON

G I R A   H O N G, G-I-R-A, last name, H-O-N-G, a Korean interpreter was duly sworn.

I R I S   S H O N, having been duly sworn through the Korean interpreter, testified as follows:

EXAMINATION

BY MR. CHOI:

Q. Good morning, Ms. Shon. Do I pronounce it correctly, your name?

A. Yes.

Q. My name is Hyun Choi. I'm with the Park Law Group, and we represent Easytex Corporation Ltd., the plaintiff in this litigation.

As you know, we subpoenaed you for a deposition because the plaintiff believes that you may have knowledge that would be helpful in this case.

A. Yes.

Q. A deposition gives the attorneys an opportunity to ask you questions concerning the knowledge you may have that may have a bearing in this litigation.

A. Yes.

Q. Have you been deposed before?

Page 8:

IRIS SHON

A. This is my first time.

Q. Under the Federal Rules of Civil Procedure, I have the right to ask you certain questions today. After I ask a question, please take all the time that you feel is necessary to think about the questions before you answer it.

A. Yes.

Q. We want your best recollection. And as the events happened some time ago, you may need time to think back.

If you do not understand my questions or if it is in any way confusing or ambiguous or if you did not hear my question, please ask me to repeat it or rephrase it.

A. Yes.

Q. If I ask you a question and you feel that a review of a document would be helpful to you in answering, please say so.

If you become tired, or for any other reason you would like to take a break, please let me know. I only ask that the request be made after an answer has been given by you if a question is pending.

As you can see, the court reporter is

Page 9:

IRIS SHON

recording everything that is said here today. To assist the court reporter, I ask that we follow a few rules. It is difficult for the court reporter to record everything said if we both talk at the same time. I'll try to be sure that I do not start a new question until you have completed your answer to the pending question. Please be sure to allow me to fully complete the question before you begin to answer.

Please answer the questions verbally and not with nods of the head. This deposition is being reduced to written form. And it is difficult for the reporter to record gestures. If you tend to speak rapidly --

THE INTERPRETER: Speak what?

Q. Rapidly, please try to slow down. It will give you more time to think and make the reporter's job easier.

As you know, we also have an interpreter here today, which makes the work of the court reporter a bit more difficult. Please be mindful that the reporter is able to record only what one person says at a time.

Therefore, it is very important that

**Page 42**

IRIS SHON

understand better maybe their client's respective roles with respect to how many shipments were inbound, how many shipments were outbound, and then reexported inbound again.

    MR. CHOI: That's fine. You can discuss with counsel later.

BY MR. CHOI:

Q. For the purposes of this deposition, could you explain what you saw from the document to me?

A. I don't remember the numbers here, exact numbers. For number 1, first shipment, this was from third country to Tacoma, en route to Tacoma. The first buyer became bankrupt. The first shipment has no relevance with Mr. Chul Kyu Kim for number 2, since the buyer was not able to receive the shipment due to the bankruptcy.

    MR. CHOI: I'm sorry. When you say -- could you, without pointing out that portion of the documents, could you identify the number and, you know, which line she is referring to for the court reporter's --

A. Number 1, 2, 3. I'm indicating by Number 1, 2, 3, because they all happened

**Page 43**

IRIS SHON

concurrently.

Q. Okay. Please go ahead.

A. Number 1, again, en route to -- for Number 1, en route to Tacoma from Manila, the buyer became bankrupt. So in Tacoma, four containers were stopped.

    And No. 2 is about -- and due to the buyer becoming bankrupt and resulting in no one to receive the shipment, that's when I got a call from Baro asking me to arrange the shipment, return shipment to Busan. For that reason, I arranged reexport.

    And with respect to Number 1 and Number 2, I just explained about, we feel that neither the GFA nor the Top Ten is involved with this matter with respect to this particular lawsuit. So it was shipped back.

    So about Number 3, between Mr. Kent Wong, David Lou, and Mr. Park of Baro Shipping, together they sought a buyer whose name is Chul Kyu Kim. So this, the shipment that was en route to Tacoma, it arrived in New York.

    So upon the arrival of this shipment, Kent Wong, David Lou, and Mr. Park of Baro

**Page 44**

IRIS SHON

Shipping, they arrived around the same time and because none of these men really know Mr. Chul Kyu Kim and could not therefore trust him, so Mr. Kent Wong and Mr. Park, now I'm about to testify regarding what Mr. Park of Baro Shipping told me with respect to his conversation with Mr. Wong.

    So he asked me to pick up seven containers. And they asked me to find a warehouse to store these seven containers in. And when Kent Wong permits the release, that it can be released to Mr. Chul Kyu Kim, so I was prepared to pick up seven containers from the rail terminal.

    So I made a deal with Korea Express' warehouse. So Korea space in the rig was okay. So we made a preparation to store these shipments. To pick up these shipments, I needed to have a delivery order issued by Custom Brokers, which is DO, as well as the work order in order to pick it up from the trucking company.

    So I repeatedly contacted Mr. Chul Kyu Kim asking to have the DO sent to me. For nearly a day, he repeatedly said that he would not be able to release it to me. He yelled at me, repeatedly yelled and screamed all day.

**Page 45**

IRIS SHON

    So I told him that I was not able to pick up the shipments. This is what I said to Mr. Park of Baro Shipping, that I'm not able to pick up the shipments.

    So between Mr. Park and Kent Wong had discussion, for two days they retracted, they repeatedly retracted what I should do about picking up the shipment; therefore, I was not able to do anything else for two days.

    So Kent Wong told Mr. Park of Baro Shipping to release the seven containers to Mr. Chul Kyu Kim. So before the shipment was released, myself and my husband, along with Mr. Kent Wong, David Lou, Mr. Park of Baro Shipping had met up for dinner, and had discussions regarding this matter. And they stayed at a hotel I recommended, which is Capri Hotel, C-A-P-R-I.

    THE INTERPRETER: Yeah, Capri.

A. So while they stayed there, and then between Mr. Wong and Mr. David Lou and Mr. Park, they repeatedly had a meeting to discuss this matter.

    And then finally, I received a call

12 (Pages 42 to 45)

## Page 46

IRIS SHON

from Mr. Park of Baro Shipping. While he was talking to me on the phone, he was also engaged in talking with Mr. Kent Wong. And when Mr. Kent Wong said to release the shipment, and because Baro Shipping had to collect freight charges from Chul Kyu Kim, and they said that Mr. Kim had agreed to pay that amount, so Mr. Chul Kyu Kim did pay the bill, and because it was $140,000, he brought it in two checks. And that he urgently needed the shipment.

And it was Friday, and because it was just a regular check, I wanted to have a certified check, and Mr. Kim said he's not able to issue a certified check. So because of my lack of knowledge, I wanted to know if it would be okay to receive certified check. And a few people in response to my question said that even with the certified check, the issuer could otherwise put a stop payment.

And even Kent Wong told Mr. Park of Baro Shipping to release the shipment so that he could be paid and with me because this was not a certified check. And then I was told from Baro Shipping that they would assume responsibilities

## Page 47

IRIS SHON

about this check and that it would be okay to release the shipment. So nearly at 4 p.m. on Friday, Mr. Chul Kyu Kim paid a visit to my office. So I received his check. And at that time, there was the freight of $40,000 which had to be paid for Hyundai Marine, ocean freight, and to be paid by Top Ten.

So from the carrier part, custom clearance was taken care of, and then with respect to original bill of lading, it was okay because there was a surrender and ocean freight was paid. So it was good.

And now with respect to terminal, they were going to release the shipment upon the receipt of the DO, delivery order. So I released everything because I cannot pick it up myself.

On Friday, Kent Wong expressed that he wanted to go to Atlantic City because he wanted to do some gambling. So all of us went to Atlantic City being, namely, Mr. Kent Wong, David Lou, Mr. Park of Baro Shipping, myself, and my husband, and my female acquaintance.

So Mr. Kent Wong said that he had membership with a place called "Bogara,"

## Page 48

IRIS SHON

B-O-G-A-R-A, which I'm not sure of the spelling, so we took him there.

So after spending some time there, we said that we needed to go back, but Kent Wong wanted to stay more, and he did. And the next Monday, so it was like the next coming Monday, I got a call from Kent saying that he's not able to contact Mr. Chul Kyu Kim. I don't know about David Lou, but I knew Mr. Young Man Park had returned to Korea, so Kent Wong remained in the U.S. but failed to receive any monies from Mr. Chul Kyu Kim.

So he contacted me repeatedly because I didn't know what was going on. So I called Hyundai Rail Terminal to find out who picked up a shipment, a company called 3 Win. It's one of the companies we also work with that there's a work relationship.

So I called them. I asked where the cargoes were. So when I gave them the container numbers, they said that they are somewhere in Bronx. So all the information I got from them, I relayed to Kent. So, all of a sudden, 3 Win said that they will not be able to tell me anything

## Page 49

IRIS SHON

more. And when I said -- when I asked for the reason, they said they received an order from a company called Mercury, and that they were notified by Mercury to not release any information to Iris Shon.

So I contacted Mercury thinking that it might be a fraud because Mr. Chul Kyu Kim took the shipment and disappeared. And I said I needed to know -- we needed to know where the shipments were, cargoes. I repeatedly emphasized it. So the person in charge of this at Mercury said that his customer is Mr. Chul Kyu Kim, and then he's not able to release any information to me.

So at that time, I could understand his position because I'm not their customer. And, in fact, they received work order from Chul Kyu Kim, and that -- and then he is the -- he is their customer. So, you know, my -- that was the extent of my role there.

So I was told that -- I met Kent -- Chul Kyu Kim told me that he -- he looked into the inside of the container with Kent Wong. What I asked Mr. Kim, why he wasn't pay for his cargo. He replied, he devaning -- he devaned several

Page 74

IRIS SHON

BY MR. CHOI:
Q. So is it fair to say that Baro Shipping ordered Top Ten to release the goods?
A. Mr. Park of Baro Shipping indicated to me that Kent had issued an order to release the goods to consignee, Mr. Kim, so go ahead and release the cargo.
Q. Before you got the order in Baro Shipping regarding release of the goods, who held those goods?
A. It was in the NJIT Terminal, New Jersey In Transit Terminal. All seven containers were at New Jersey In Transit Terminal. So we were given -- all freight companies given one free day to allow us to pick up the container without having to incur demurrages after the cargo arrival between myself and Mr. Kim and ~Mr. Wong and Mr. Park were going back and forth about whether I should pick it up or not.
And then finally, as I mentioned before, on that Friday, it was decided that it was going to be released, and I released it.
Q. Is it correct statement when you say, "I released it"?

Page 75

IRIS SHON
A. I released it pursuant to Baro Shipping's instructions.
Q. Let me clarify on this: You testified NJIT held the goods?
A. Yes. Because the ocean freight had not been paid yet. Therefore, Hyundai, the freight company could not -- Hyundai, the carrier was not able to release it from the NJIT because they have to get the money and custom clearance, and then they can release the shipments to the terminal. They had the all-night service. And because I did not pay ocean freight, no one could pick up from NJIT.
Q. So my question: Is it correct expression when you say, "I released the goods," when those goods were held by NJIT?
A. I reiterate once again that I did -- although I released it, I did not do it on my personal terms, but it was carried out pursuant to Baro Shipping's instructions.
MR. GONZALEZ: I'm going to object to that. I think the translation is losing. I think she's asked and answered those questions maybe 15 times already and I think the record will reflect

Page 76

IRIS SHON
and I think she's not correctly translating this. She did not physically release the cargo, if that's what she's saying, trying to say.
BY MR. CHOI:
Q. Did you physically release the goods?
A. No.
Q. Who released the goods physically?
A. Pursuant to the Baro Shipping's instruction, I pay the ocean freight to Hyundai. That's it. That's the extent of my role. That's the extent of my role. I have to pay the ocean freight to Hyundai.
It's not like I, you know, personally handed over the cargo to Mr. Kim. As indicated, an independent company called Mercury, which was hired by Mr. Chul Kyu Kim, and based upon the information, I searched the 3 Wins Trucking Company, which is also named as a defendant, one of the defendants, the 3 Wins, and based on Mercury's order, 3 Wins picked up the cargoes.
It's not like I handed -- I personally handed over the freights to Mr. Kim Chul Kyu, but in order to release the cargo, all I could do was to pay the ocean freight, and that was the extent

Page 77

IRIS SHON
of my role in this.
Q. So it is fair -- is it fair to say that after your payment of freight charge to Hyundai, then NJIT released the goods to, presumably, 3 Win?
A. No. Just NJIT allowed someone to pick up. What I mean to say is that that NJIT released the goods to a trucker who had a delivery order issued by U.S. Customs. And like I said again, I wanted to have DO to pick it up because that's what Kent wanted, but it was not made available to me.
Q. What is the DO?
A. Delivery order. The customer indicated the delivery order that indicated the entry number, container numbers, and something like that. Chul Kyu Kim has been maintaining yelling at me and leaving it up to me to pick it up without issuing me delivery order, which was issued by U.S. Customs.
Q. How is it possible to anybody who -- anybody can receive the goods from NJIT without DO, delivery order?
A. It's not possible.

20 (Pages 74 to 77)

## Page 78

IRIS SHON

Q. Do you believe that someone who loaded those goods at the NJIT hold and presented delivery order to NJIT?

A. That's the only way to make the pickup possible. So one will require for delivery order to include entry number issued both by the carrier, Hyundai -- U.S. Customs, and that has to be, the numbers have to be consistent.

It should also state the list of container numbers and, in some cases, although it varies depending upon who's handling it, but some of them require actual trucking company name on the delivery order as well.

Q. Do you know who received those goods from NJIT?

A. I did not know then. And Mr. Park had returned to Korea, and Kent remained here a few more days to work with me.

And when I talked to Kent, I told him I'd look into this matter. So I called NJIT Terminal, Hyundai providing them with the container number. I also inquired who picked up the cargo, what trucking company. And I was told that it was -- the cargoes were picked up by 3 Win

## Page 79

IRIS SHON
Trucking Company.

So because I required to have all the relevant informations, I telephoned import customer service of Hyundai. I first asked if it went through custom clearance and inquired to know the entry number. I took down the entry number and I had believed the three digits of the entry number is authenting numbers of custom brokers.

So with those numbers, I tried to search in the Internet, and then had access information, the name of the owner of the trucking company -- no, no, custom broker -- excuse me -- custom broker whose name was Soon, S-O-O-N C-H-A-N-G, last name Hong, phonetically spelled. I'm not 100 percent certain about the spelling of it, but that's close, you know, recollection I have of the name.

So I learned about the trucking company from NJIT Terminal. And I was provided with the entry number from the Hyundai import customer service. And they went through Internet search to discover the name, whose name was Soon Chang Hong, CHB, and because 3 Win had a working relationship with my company, GFA, Top Ten Trans,

## Page 80

IRIS SHON
and because that was this relationship, I phoned them, and -- but Mr. Kim would not pick up the phone. He was not able to reach, Chul Kyu Kim.

So although Kent wanted to have these informations and I was not able to reach Mr. Kim because he wouldn't answer his phone, I had to go through these channels, which I had just described, to procure the information I needed.

And by the time Kent returned to his country, so knowing that Kent wanted to have all the information, I relayed all the information to Baro Shipping such as name of the trucking company as well as CHB and Mercury. And in that, Mercury had reached an instruction to stop disclosing any more information to me.

But prior to learning all these knowledges, I had been aware that we had picked up the goods, and that the first container was picked up by 3 Win and brought to a warehouse in the Bronx. And I even had the exact address from the driver, which I relayed to Kent on the phone when I directly contacted him.

And then I understand between Kent and Mr. Kim worked together for some time. And on one

## Page 81

IRIS SHON
occasion, Mr. Kim did actually pick up my call -- pick up a call from me, at which time, I asked him why he wasn't paying up. And as I said before, Mr. Kim, he said he devaned the container and that it was not even half full. And he said to Kent to take back everything.

And that Mr. Kim also told Kent that he paid a duty and that they did a custom clearance work and that the cost, he had incurred nearly $200,000. That's what Mr. Kim told me. So Kim, so Mr. Chul Kyu Kim said to me that -- he said to -- to Kent that he should pay up that $200,000 and take back everything.

Q. When did this series of events occur -- excuse me, sorry.

MR. CHOI: When she asks a question, could you interpret it to me so that I could answer to that question?

THE INTERPRETER: You're right. I was trying to expedite it, but I shouldn't have.

MR. CHOI: I understand.

THE INTERPRETER: I should ask. Which events?

BY MR. CHOI:

```
                                          114
 1            IRIS SHON
 2    believe --
 3        A.  I don't know. Okay. Let me check (In
 4    English).
 5        Q.  Could you identify the document number
 6    4?
 7        A.  TOP 041.
 8            It says, freight has been paid and,
 9    i.e., that immediate export has posted.
10            And then it says only item holding
11    import side from being released is demurrage. The
12    total demurrage through August 11th.
13        Q.  Okay, okay. I can understand because
14    it's written in English.
15            Did you pay that $720 to HMM?
16        A.  I did.
17        Q.  Did Top Ten pay for that $720 to HMM?
18        A.  Yes.
19        Q.  Did you get this payment -- withdrawn.
20            After Top Ten's payment of $720 to
21    HMM, did Top Ten get compensated for their payment
22    from somebody?
23        A.  We received debit net from Baro
24    Shipping.
25        Q.  Could you identify that document?
```

```
                                          115
 1            IRIS SHON
 2        A.  Number TOP 040.
 3            MR. CHOI: Thank you. I have a last
 4    question for today, but I will have -- but I will
 5    reserve the right as agreed by all counsel
 6    appearing today.
 7            We will continue this deposition for
 8    another day as agreed by other counsel and counsel
 9    present at the deposition of today. Your attorney
10    also agreed to my request to continue this
11    deposition for another day.
12            MR. GONZALEZ: With the understanding
13    that it would only be one more day.
14            MR. CHOI: I have a last question:
15        Q.  Have you heard about the person Soon
16    Chang Hong?
17        A.  I did not hear of him before this
18    incident.
19        Q.  How long after the litigation
20    commenced?
21        A.  So based on Baro's request to provide
22    all the information, I was provided with his name
23    from HMM.
24            THE INTERPRETER: Can you ask that
25    question once again?
```

```
                                          116
 1            IRIS SHON
 2            MR. CHOI: Could you repeat that
 3    question?
 4            (Record read.)
 5        A.  Baro Shipping indicated to me that
 6    Kent wants to know in the full status of the
 7    situation. I called the customer service import
 8    department of HMM. And asked for the entry number
 9    for custom clearance. And they provide me with
10    one of the entry numbers. With that entry number,
11    I did the search on the Internet to verify the
12    name of the company. That's how I learned of the
13    name Soon Chan Hong, and that he is the custom
14    house broker for Chul Kyu Kim.
15        Q.  Have you spoken with Mr. Hong before?
16        A.  Never before did I ever have never
17    spoken with Mr. Hong.
18        Q.  Have you met Mr. Hong before?
19        A.  No.
20        Q.  Do you have knowledge who selected
21    Mr. Hong as custom broker regarding seven
22    containers shipment?
23        A.  Okay. Just that if where 3 Win said
24    that they were hired by Mercury, and that they
25    were instructed not to release any information to
```

```
                                          117
 1            IRIS SHON
 2    me, and I have further learned that Mr. Kim had
 3    hired Mercury.
 4        Q.  How about Mr. Hong?
 5        A.  I called Mercury and spoke to an
 6    employee who's name is Uni who told me that she
 7    was instructed by Mr. Kim to not say anything to
 8    me and that she could not provide me with any
 9    information.
10            Other than that, how I learned that
11    Mr. Hong was the broker for them is because I
12    think that Mercury certainly hired 3 Wins, and
13    because I have never spoken with Mr. Hong before,
14    ever, and I -- so I presume under the
15    circumstances, that the Mercury had contacted
16    Mr. Hong.
17            MR. CHOI: Thank you for your answers
18    today. Again, I reserve my right to continue this
19    deposition for another date as agreed by counsel.
20            And also I want to mark that Mr. Carl
21    Person, attorney for defendants American
22    International Line and Mercury didn't return to
23    the deposition after he left the deposition during
24    the morning session.
25            Thank you. Please go ahead --
```

30 (Pages 114 to 117)

### Page 118

```
1              IRIS SHON
2          THE WITNESS: Can I say one more
3   thing?
4          MR. CHOI: Please, go ahead.
5          THE WITNESS: I think the head,
6   Mercury released all the information I needed back
7   then. I firmly believe that none of these things
8   could have possibly happened.
9          MR. CHOI: Thank you, Ms. Shon. We
10  will see you later.
11         (Whereupon the proceedings were
12  concluded at 5:09 p.m.)
```

### Page 119

```
2                oOo
3          I, IRIS SHON, the witness herein,
4   do hereby certify that the foregoing testimony of
5   the pages of this deposition to be a true and
6   correct transcript, subject to the corrections, if
7   any, shown on the attached page.
8          _____
9                  IRIS SHON
10  Subscribed and sworn to before me this
11  _____ day of _____, _____.
12
13  _____
14         NOTARY PUBLIC
```

### Page 120

```
2   STATE OF NEW YORK  )   Pg. of Pgs.
3   COUNTY OF NEW YORK )
4          I wish to make the following changes for the
5   following reasons:
6   PAGE  LINE
7   ___   ___    CHANGE: _____
8               REASON: _____
9   ___   ___    CHANGE: _____
10              REASON: _____
11  ___   ___    CHANGE: _____
12              REASON: _____
13  ___   ___    CHANGE: _____
14              REASON: _____
15  ___   ___    CHANGE: _____
16              REASON: _____
17  ___   ___    CHANGE: _____
18              REASON: _____
19  ___   ___    CHANGE: _____
20              REASON: _____
21  ___   ___    CHANGE: _____
22              REASON: _____
23  ___   ___    CHANGE: _____
24          _____
                        IRIS SHON
```

### Page 121

```
2                  CERTIFICATE
3          I, AMY A. RIVERA, a Certified Shorthand
4   Reporter, Registered Professional Reporter, Certified
5   LiveNote Reporter, and Notary Public of the State of New
6   York, do hereby certify that prior to the commencement
7   of the examination IRIS SHON was duly sworn by me to
8   testify the truth, the whole truth and nothing but the
9   truth.
10         I DO FURTHER CERTIFY that the foregoing
11  is a true and accurate transcript of the testimony as
12  taken stenographically by and before me at the time,
13  place and on the date hereinbefore set forth.
14         I DO FURTHER CERTIFY that I am neither a
15  relative nor employee nor attorney nor counsel of any of
16  the parties to this action, and that I am neither a
17  relative nor employee of such attorney or counsel, and
18  that I am not financially interested in the action.
19
20  _____
21      Notary Public of the State of New York
22      My commission expires August 29, 2009
23      License No. XI00939
24  Dated: August 25, 2008
```